# EXHIBIT 5

# TO THE SUPPLEMENTAL DECLARATION OF MICHELLE M. UMBERGER IN SUPPORT OF SUMMARY JUDGMENT OF UNENFORCEABILITY OF THE PATENTS-IN-SUIT DUE TO INEQUITABLE CONDUCT

Dockets.Justia.com

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3


4    THE REGENTS OF THE UNIVERSITY
     OF CALIFORNIA, etc.,
5
              Plaintiff,
6
         vs.                              No. C 0305669 (JW)
7
     MICRO THERAPEUTICS, INC., etc.,
8    et al.,

9             Defendants and
              Third Party Plaintiffs,
10
         vs.
11
     BOSTON SCIENTIFIC CORPORATION,
12   etc., et al.,

13            Third Party Defendants.

14   _____

15

16            Deposition of DANIEL L. DAWES, taken on behalf

17   of Defendants and Third Party Plaintiffs, at

18   17900 Jamboree Road, Irvine, California, beginning at

19   9:03 a.m., and ending at 4:44 p.m., on Tuesday, May 17,

20   2005, before PEGGY BROGNA, Certified Shorthand Reporter

21   No. 4512.

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Q    All right.  So you tell me how much more time

2  you need in answering the questions that I put and I'll

3  give it to you.

4        There is a two-paragraph description if you

follow with me to page 603 under the 1980, '82 time

6  period.  And here you'll note the specific reference to

7  a thesis.

8    A    Yes.

9    Q    All right.  And that's the reference point that

I'm going to be making in the following questions.

11        When you read this brochure, was this the first

12  time you were ever aware of that thesis?

13    A    Yes.

14    Q    And at any time did you ask to see a copy of

that thesis?

16    A    Yes.

17    Q    Did you in fact see a copy of that thesis at

18  some time?

19    A    Yes.

Q    And how was it that you obtained that copy at

21  that time?

22        MR. SHUSTER:  Objection; mischaracterizes

23  his --

24        THE WITNESS:  Yeah, I never obtained a copy.  I

saw the thesis in the same sense that I see that binder

| | | |
|---|---|---|
| 10:47 | 1 | sitting on your side of the table. |
| | 2 | BY MR. SKILTON: |
| | 3 | Q All right. Describe how it was and when it was |
| | 4 | you saw that thesis for the first time. |
| 10:47 | 5 | A When it was? Sometime after, obviously, I |
| | 6 | received this history of the GDC, which I don't -- I |
| | 7 | cannot give you a numerical date when that was other |
| | 8 | than I was -- obviously after this was published. |
| | 9 | Q Let me drop back a little bit and get your |
| 10:47 | 10 | understanding of what this document was, and then we'll |
| | 11 | go back to the thesis. What did you understand this |
| | 12 | Target brochure history of the GDC to be? |
| | 13 | A I'm not sure I understand the question. This |
| | 14 | is -- this is -- I understood this to be a marketing |
| 10:48 | 15 | piece. |
| | 16 | Q And did you ask to whom it was distributed, or |
| | 17 | did you know? |
| | 18 | A I did not know. |
| | 19 | Q Did you know whether it had in fact been |
| 10:48 | 20 | published outside of the four corners of the Target |
| | 21 | organization, for example? |
| | 22 | A That's true, I also do not know that. |
| | 23 | Q Did you have an assumption as to what this |
| | 24 | brochure was and to whom it was distributed at the time |
| 10:48 | 25 | that you first read it? |

1    at that time?

2         A    No.

3         Q    You did, however, ask Dr. Guglielmi to bring

4    his thesis in; is that correct?

5         A    No.

6              MR. SHUSTER:  That's privileged.

7    BY MR. SKILTON:

8         Q    Sorry, I'm not trying to pull it out.

9         A    You're making --

10        Q    You've been instructed not to answer that.

11        A    You're making assumptions of fact that are not

12   true.

13        Q    Let me get back to the assumptions, and then

14   we'll determine what is true.  You did see the thesis

15   after you saw this document; correct?

16        A    Yes.  Yes.

17        Q    How is it that you saw that thesis after you

18   read this document?

19        A    I went to Dr. Guglielmi's office.

20        Q    And when did you go to his office?

21        A    I can't put a date on it.  It was, you know,

22   subsequent to the telephone call.  A few days, maybe, a

23   week, whenever -- whenever we were both available

24   shortly after that.

25        Q    All right.  And did you -- you said that the

| | | |
|---|---|---|
| 10:56 | 1 | thesis was in the room? |
| | 2 | A    Yes. |
| | 3 | Q    You saw it? |
| | 4 | A    Yes. |
| 10:56 | 5 | Q    Where physically was it in his office? |
| | 6 | A    On a shelf behind his desk. |
| | 7 | Q    And did he take it off the shelf? |
| | 8 | A    Yes. |
| | 9 | Q    And was it in Italian? |
| 10:56 | 10 | A    Yes, as far as I know. |
| | 11 | Q    Did you even touch it? |
| | 12 | A    No. |
| | 13 | Q    Did you ask to see photographs? |
| | 14 | MR. SHUSTER:  Objection; privileged. |
| 10:57 | 15 | MR. SKILTON:  Strike that. |
| | 16 | Q    Did you see photographs? |
| | 17 | A    Yes. |
| | 18 | Q    And were they in the thesis? |
| | 19 | A    Yes. |
| 10:57 | 20 | Q    And where were they in the thesis? |
| | 21 | A    They were black-and-white snapshots glued to |
| | 22 | the pages -- affixed in some manner, I don't know how. |
| | 23 | Q    And how many such photographs were there, to |
| | 24 | your recall? |
| 10:57 | 25 | A    I don't remember. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| | | |
|---|---|---|
| 10:57 | 1 | Q How many pages were there in that document? |
| | 2 | A I don't know. |
| | 3 | Q How thick was it? |
| | 4 | A Thin. It was thin. It looked like it could be |
| 10:57 | 5 | 10 pages, 15 pages, something on that order. |
| | 6 | Q Both sides; do you know? |
| | 7 | A I don't remember that. |
| | 8 | Q Was it bound? |
| | 9 | A In some manner, yes, uh-huh. |
| 10:57 | 10 | Q All right. Now, do the best you can to recall |
| | 11 | that manner. What was it, was hardbound? |
| | 12 | A I do not recall that. |
| | 13 | Q You know from reading this document that there |
| | 14 | was a thesis that he carried around the world with him |
| 10:58 | 15 | to try to market his research. |
| | 16 | A I don't know that. |
| | 17 | Q Well, if you read on, you'll find -- I'll |
| | 18 | represent that it says that, for example, he took it to |
| | 19 | Dr. Vinuela the next year in Canada. Do you see where |
| 10:58 | 20 | that is in context? |
| | 21 | A Well, I think you read into it. It doesn't |
| | 22 | say -- you make it sound like he took this thesis around |
| | 23 | the world as a marketing piece. I don't know that. |
| | 24 | Q Well, did you ask him -- |
| 10:58 | 25 | A It just says he hoped to share his findings. |

78

1        Q     Hoped to share.  I'm not going to -- I'll

           2   withdraw the last question.

           3        How long did you talk to Dr. Guglielmi about

           4   that thesis?

5        A     I don't know.  I mean, we talked about the

           6   entire brochure, not just the thesis.

           7        Q     How long was this conversation; do you recall?

           8        A     Less than an hour.

           9        Q     And did you do anything as a result of this

10   conversation with Dr. Guglielmi in reference to

          11   materials or information that you had learned about in

          12   the thesis -- or, excuse me, in the Target brochure?

          13        A     I obtained from Dr. Guglielmi all the published

          14   articles that I could ascertain existed that were

15   referenced in the brochure.

          16        Q     And do you remember today what articles he

          17   surrendered as a result of your request?

          18        A     I have no specific recollection, but I put them

          19   all in the IDS and they're all listed there.

20        Q     What IDS are you now referring to?

          21        A     There's an IDS we filed in the PTO with respect

          22   to the GDC cases.

          23        Q     Was it on or around October 6 of 1997?

          24        A     That sounds about the right date, yes.

25        Q     Have you reviewed that IDS in the last

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| | | |
|---|---|---|
| 11:21 | 1 | copy or preserve it? |
| | 2 | MR. SHUSTER: Objection; privileged. Instruct |
| | 3 | the witness not to answer the question. |
| | 4 | BY MR. SKILTON: |
| 11:21 | 5 | Q Did you thereafter, and now after the meeting, |
| | 6 | take any investigative steps in reference to the thesis? |
| | 7 | A Yes. |
| | 8 | Q And what steps did you take? |
| | 9 | A I wanted to determine whether or not the thesis |
| 11:21 | 10 | was published. |
| | 11 | Q And why did you want to make that |
| | 12 | determination? |
| | 13 | A To determine whether or not it could be prior |
| | 14 | art. |
| 11:21 | 15 | Q What steps did you take? |
| | 16 | A Interviewed Dr. Guglielmi concerning whether or |
| | 17 | not his copy had been published in any sense, determined |
| | 18 | the existence of other copies. |
| | 19 | Q Okay. Anything else? |
| 11:22 | 20 | A And hired an Italian firm to search for other |
| | 21 | copies. |
| | 22 | Q And what firm did you hire? |
| | 23 | A This is the Barnardo & Zanardo firm. |
| | 24 | Q Do your best to spell it so I'll try to -- |
| 11:22 | 25 | A B-a-r-n-a-r-d-o. Zanardo is Z-a-r-n-a-r-d-o, |

11:24 1    A    Yeah.

2    Q    -- we can at least put a date here based on

3    what we do have, and --

4         (Discussion off the record.)

11:24 5         MR. SKILTON:  Tell you what, we'll do that

6    after lunch.  I don't wish to lose my valued colleague

7    even for a minute.

8    Q    Now, you said it was all in a piece.  Tell me

9    what you meant by that -- or a one-piece --

11:24 10        Maybe you can read the answer back if you want

11   a reference point.

12   A    In addition to, you know, assembling these

13   references, I continued to -- at the same time to

14   continue to look for other copies of this thesis.

11:25 15   Q    You did personally?

16   A    No, no, I didn't.  Well, commissioned through

17   the Italian law firm.

18   Q    All right.  So you yourself did certain things

19   following the meeting in reference to the subject of

11:25 20   that Target brochure.  List what you did.

21   A    I mean, I pulled together the references,

22   including everything I knew about that I had in my

23   files, and put it in the IDS.

24   Q    There's -- if you look at item 14 on the IDS,

11:25 25   that is a Guglielmi article.  When did you obtain a copy

1    and that would have been through Ciotti in general or

2    Wheelock, but --

3        Q    Do you remember whether or not you advised them

4    that you were undertaking an investigation of the Target

5    marketing brochure?

6        A    No, I don't have that recollection.  I

7    certainly didn't -- I didn't report to Ciotti, so I

8    didn't need to tell him what I was doing or, you know,

9    get his permission or --

10        Q    Tell me about the process with Mr. Cossu.  You

11    retained his firm; correct?

12        A    Yeah, I would presume that's right.  I retained

13    Mr. Cossu, and --

14        Q    All right.  And did you meet with him

15    personally before giving him an assignment?

16        A    No.

17        Q    Did you talk to him by telephone?

18        A    Yes.

19        Q    And what did you tell him at that time?

20        MR. SHUSTER:  Objection; that's privileged.

21    I'm going to instruct the witness not to answer.

22        MR. SKILTON:  Let's be sure I understand the

23    scope of your privilege.  Your position is that Cossu

24    and communications with Cossu are attorney-client

25    privilege?

1          MR. SHUSTER:  Yes.

          2          MR. SCHWILLINSKI:  And I believe they could --

          3    they also --

          4          MR. SHUSTER:  Common interest.

11:37     5          MR. SCHWILLINSKI:  And attorney work product.

          6          MR. SKILTON:  Well, is it your position that

          7    there was a pending or threatened litigation?

          8          MR. SCHWILLINSKI:  There were contemplated --

          9    well, without revealing -- I don't want to reveal work

11:37    10    product itself, but it's our representation that we can

         11    validly assert work product at that time frame.  I'm

         12    assuming the time frame is this -- you know, somewhere

         13    around this '97 time frame when this IDS was filed.

         14          MR. SKILTON:  Well, I'll tell you, I will

11:38    15    represent that I'll try to be a little more specific on

         16    time frame after the noon hour, and I'm not here -- if

         17    your objection would float depending on the time frame,

         18    that's one thing.

         19          MR. SCHWILLINSKI:  It's that general '96 to '97

11:38    20    time frame at a minimum.  At least at that point, I

         21    believe work product can be asserted.

         22    BY MR. SKILTON:

         23      Q    Was there a point in time from the time of

         24    engagement to the time of the actual translation that

11:38    25    there was a meeting with Mr. Cossu?

1      A      No.

       2      Q      How many telephone conversations, if you

       3  recall, did you have in total with Mr. Cossu prior to

       4  receiving a copy of the translation?

11:38  5      A      Maybe two.

       6      Q      Was Mr. Ciotti involved in any -- either of

       7  these telephone conversations, if you recall?

       8      A      No.

       9      Q      Was Dr. Guglielmi involved in either of these

11:39  10  conversations, if you recall?

      11      A      Yes.

      12      Q      In both?

      13      A      No.

      14      Q      In the first or the second?

11:39  15      A      The second.

      16      Q      And is it possible for you to put a date on

      17  that second conversation, even approximate?

      18      A      Well, it would have been before delivery of the

      19  written translation.

11:39  20      Q      All right.  And how long did the telephone

      21  conference involving you and Dr. Guglielmi and Mr. Cossu

      22  last?

      23      A      I can't recollect.  15 minutes, 20 minutes,

      24  something on that order.

11:39  25      Q      Was the issue of the meaning of a particular

1    word or phrase the subject of that telephone

       2    conversation?

       3            MR. SHUSTER:  Objection; it's also privileged.

       4    Instruct the witness not to answer.

11:40  5    BY MR. SKILTON:

       6       Q    Did you at the time of this telephone

       7    conversation have an understanding that there was a

       8    particular word or phrase that was subject to a

       9    translation issue?

11:40  10            MR. SCHWILLINSKI:  Objection; vague.

       11            THE WITNESS:  Yes.

       12   BY MR. SKILTON:

       13      Q    And what was that word or phrase that -- as you

       14   now recall?

11:40  15            MR. SCHWILLINSKI:  Objection.  I believe that

       16   calls for attorney-client privileged information and

       17   attorney work product.

       18            MR. SHUSTER:  Yeah, I'll join the objection.

       19            THE WITNESS:  I take that to be an instruction

11:40  20   not to answer.

       21            MR. SHUSTER:  Yeah.

       22   BY MR. SKILTON:

       23      Q    I understand it to be that.

       24            And I think I want to fully make the record.

11:40  25   I'm not asking here for a communication, I'm asking for

                                                                    99

1 whether this witness had an understanding. And so --

2 and I want you to hear the question clearly and be

3 informed of that question as a part of your instruction,

4 so I'll state it again.

11:41 5 Did you have an understanding at the time of

6 this second call that there was a particular word or

7 phrase that was subject to a translation issue; yes or

8 no?

9 MR. SCHWILLINSKI: I would restate my

11:41 10 objection. To the extent any understanding is learned

11 through an attorney-client privileged communication or

12 attorney work product, I would object to that question.

13 MR. SHUSTER: And I join in the objection.

14 THE WITNESS: So am I to answer?

11:41 15 MR. SKILTON: So the record reflects an

16 instruction that he not answer that question?

17 MR. SHUSTER: Correct.

18 BY MR. SKILTON:

19 Q Did you understand at that time that the word

11:41 20 "rottura" had alternative meanings in Italian?

21 MR. SHUSTER: The same objection.

22 MR. SKILTON: The same instruction?

23 MR. SHUSTER: Yes.

24 BY MR. SKILTON:

11:42 25 Q Were you aware that the word "rottura" could be

1    translated to mean detached or separated?

2              MR. SHUSTER:  The same objection and same

3    instruction.

4    BY MR. SKILTON:

5        Q    Was this the subject of a conversation with

6    Mr. Cossu during this second conversation involving

7    Dr. Guglielmi?

8              MR. SHUSTER:  The same instruction.

9    BY MR. SKILTON:

10       Q    Was a decision made to go with an alternative

11   construction of the word "rottura" and the phrase in

12   which it is contained such that the only interpretation

13   made by the -- by Mr. Cossu was that it would mean words

14   to the effect that there was disintegration of the tip

15   as distinct from detachment of the tip?

16             MR. SHUSTER:  The same objection and the same

17   instruction.

18             MR. SCHWILLINSKI:  I would object as vague and

19   compound.

20   BY MR. SKILTON:

21       Q    Were you aware that the word "rottura" could be

22   interpreted in Italian to mean rupture, break, or words

23   to that effect?

24             MR. SHUSTER:  The same objection and the same

25   instruction.

| | | |
|---|---|---|
| 11:43 | 1 | BY MR. SKILTON: |
| | 2 | Q   Did you make a decision to request Mr. Cossu to |
| | 3 | give only one interpretation of the word "rottura"? |
| | 4 | MR. SHUSTER:  The same objection and the same |
| 11:43 | 5 | instruction. |
| | 6 | BY MR. SKILTON: |
| | 7 | Q   Did Dr. Guglielmi confirm to you that that was |
| | 8 | the construction that he intended to have for the word |
| | 9 | "rottura" during this telephone conversation? |
| 11:43 | 10 | MR. SHUSTER:  The same objection, the same |
| | 11 | instruction. |
| | 12 | Can we just take a minute to go off the record? |
| | 13 | Thank you. |
| | 14 | THE VIDEOGRAPHER:  We are off the record at |
| 11:44 | 15 | 11:43 a.m. |
| | 16 | (Recess.) |
| | 17 | THE VIDEOGRAPHER:  We are back on the record at |
| | 18 | 11:45 a.m. |
| | 19 | (Defendants' Exhibit 214 marked.) |
| 11:45 | 20 | BY MR. SKILTON: |
| | 21 | Q   Mr. Dawes, I have placed in front of you |
| | 22 | Exhibit 214 which on its face purports to be a letter |
| | 23 | from Franco Cossu to yourself dated May 27, 1996.  And |
| | 24 | you'll see a received stamp, May 29, 1996.  Do you |
| 11:45 | 25 | recognize this document? |

102

A    No.

        Q    You'll see on the top of the pages that
certainly with respect to Mr. Cossu's receipt, that
seems to establish, once again, that the eighty -- the
'96 date is correct.  Do you see that at top?

        A    Yeah, it's difficult to read -- oh, yeah, 446
is clearer, it appears to be a fax time date.

        Q    Was there a -- strike that.

            Let's go back, then, to the translation.  Does
the translation -- the English translation commence at
page 441?

        A    That's my understanding.

        Q    Was there a draft of this translation available
to you prior to the date of May 27th, 1996?

        A    No.

        Q    Was the telephone call that you have described
with -- involving Dr. Guglielmi prior to the date of
May 27th of 1996?

        A    I believe so.

        Q    Now, I'm going to refer you to page 443 of
document 214, and in particular the paragraph that
begins "In three cases."  And I'll read it out loud.
"In three cases thrombus formation was partial, with
breakdown," asterisk, "of the electrode tip in the
fundus of the aneurysm."  Was this a sentence that was

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| 11:51 | 1 | the subject of that telephone call involving |
| | 2 | Dr. Guglielmi before this translation was sent to you? |
| | 3 | MR. SHUSTER: Objection; privileged. Instruct |
| | 4 | the witness not to answer. |
| 11:51 | 5 | BY MR. SKILTON: |
| | 6 | Q   And you'll see the asterisk, then, refers the |
| | 7 | reader to a translator's note. Do you see that? |
| | 8 | A   Yes. |
| | 9 | Q   And the note reads, "The term," quote, |
| 11:51 | 10 | "breakdown," end quote, "is used here in its meaning of |
| | 11 | decomposition, (see Webster's Third New International |
| | 12 | Dictionary," quote "breakdown," end quote, "6a)," close |
| | 13 | paren. "Specifically chemical decomposition resulting |
| | 14 | from the electrolytic process undergone by the |
| 11:52 | 15 | electrode." |
| | 16 | Is this a note which was based on that |
| | 17 | conversation with Dr. Guglielmi? |
| | 18 | MR. SHUSTER: Objection; privileged. Instruct |
| | 19 | the witness not to answer. |
| 11:52 | 20 | BY MR. SKILTON: |
| | 21 | Q   Was the translator, Mr. Cossu, aware that there |
| | 22 | was another definition of the word that is being |
| | 23 | translated here? |
| | 24 | MR. SHUSTER: Objection; privileged. Instruct |
| 11:52 | 25 | the witness not to answer. Also calls for speculation. |

106

1   BY MR. SKILTON:

2       Q    Did you discuss with Mr. Cossu the fact that
3   there was another definition of the word here being
4   translated?

11:53   5           MR. SHUSTER:  Objection; privileged.  Instruct
6   the witness not to answer.

7   BY MR. SKILTON:

8       Q    And if you'll look at page 447, you'll see the
9   Italian version under "Conclusions."  Are you
11:53  10   following --

11      A    Yes.

12      Q    -- where I am?

13      A    Yes.

14      Q    And specifically the question I have, is the
11:53  15   phrase "con rottura della punta dell'elettrodo nel fondo
16   dell'aneurisma" the one that is translated in the
17   paragraph we just quoted?

18      A    Okay.

19      Q    Is that the one, to your understanding?  Is
11:53  20   that phrase the one that was translated and is the
21   subject of the translator's note?

22      A    Well, please understand that I am profoundly
23   illiterate in Italian.  I don't speak or read Italian to
24   any extent, and the word "rottura" is used there.

11:54  25      Q    Was that the phrase that was the subject of the

1   telephone conversation involving Dr. Guglielmi prior to

2   the date that Cossu sent this translation to you?

3         MR. SHUSTER:  Objection; privileged.  Instruct

4   the witness not to answer.

5   BY MR. SKILTON:

6      Q    Was the word "rottura" specifically discussed

7   in that conversation involving Dr. Guglielmi and

8   Mr. Cossu?

9         MR. SHUSTER:  The question is privileged.

10   Instruct the witness not to answer.  The answer to that

11   question is privileged.

12   BY MR. SKILTON:

13      Q    Now, how, if at all, did you make use of this

14   May 27th, 1996 translation in your activities as the

15   lawyer responsible for the prosecution of the Guglielmi

16   patent?

17      A    I believe I supplied it to the patent office.

18      Q    And when did you first supply that to the

19   patent office?

20      A    The file history would show that exactly.

21   Again, I can't put a date on it.  I might have -- might

22   have been -- accompanied the IDS here.

23      Q    All right.  Let me make a representation, and

24   not for any other purpose than to state my

25   understanding.  And if it's incorrect, I wish to be

| | | |
|---|---|---|
| 12:04 | 1 | Q    Did you have -- did you make any notes of that |
| | 2 | meeting? |
| | 3 | A    No.  I mean, you're focused on -- focused on |
| | 4 | what's going on in the meeting and not really note |
| 12:04 | 5 | taking. |
| | 6 | Q    Do you know whether Mr. Ciotti made any notes? |
| | 7 | A    I didn't see him make any notes, no. |
| | 8 | Q    How long did the meeting last? |
| | 9 | A    Maybe an hour, hour and a half. |
| 12:05 | 10 | Q    And describe who talked in sequence, to the |
| | 11 | best of your recollection. |
| | 12 | A    As you know, the interviews are very informal, |
| | 13 | conducted in the office of the examiner, and so |
| | 14 | everybody spoke, but Dr. Guglielmi gave the PowerPoint |
| 12:05 | 15 | presentation, talked about the prior art and its |
| | 16 | differences from the invention, talked about the |
| | 17 | invention, provided some slides about the GDC.  Then I |
| | 18 | discussed the claims. |
| | 19 | Q    Did you have a copy of the PowerPoint |
| 12:05 | 20 | presentation? |
| | 21 | A    I'm not sure I did.  It was on a computer that |
| | 22 | Dr. Guglielmi had.  He put that presentation together, |
| | 23 | and I'm not sure I ever got a copy of it. |
| | 24 | Q    Have you ever seen a hard copy, a hard paper |
| 12:06 | 25 | copy? |

1    A    Yes.

2    Q    And where did you see that hard paper copy?

3    A    We had it with us at the interview.

4    Q    Am I right in saying that that's the way it was

5 presented to the examiner?

6    A    No.  We had a projector.

7    Q    And when you say "we" had it, who had copies of

8 the PowerPoint presentation?

9    A    Guido.

10    Q    And you had one?

11    A    A digital copy?

12    Q    No, I'm talking now about the paper copy.

13    A    I thought I had, but I don't know where it is.

14 I can't --

15    Q    Have you ever looked for it?

16    A    Yes.  And maybe I never had a copy, a hard

17 copy.  I thought we left it with the examiner.

18    Q    Well, let me see what you do recall.  You

19 recall that it was presented to him in the form of a

20 slide presentation, so to speak?

21    A    Yes.

22    Q    Was it with a screen or on the wall or do you

23 recall?

24    A    On the wall.

25    Q    It was in the examiner's office?

| | | |
|---|---|---|
| 12:08 | 1 | ultimately ending up, you know, here's our invention and |
| | 2 | this is what's different from it. |
| | 3 | Q    Now, at the time of this meeting, was the |
| | 4 | examiner, to your observation, in possession of the IDS? |
| 12:09 | 5 | A    I mean, we have to check the dates in the file |
| | 6 | history.  I think it's all within this time period |
| | 7 | that we -- we had the interview, we filed the IDS, we -- |
| | 8 | I think there should be an amendment that was filed. |
| | 9 | Q    We'll get that, but I believe the record |
| 12:09 | 10 | reflects that the date is October 6 of 1997. |
| | 11 | A    For the interview, yeah. |
| | 12 | Q    And for the filing of the amendments, but I |
| | 13 | will confirm that. |
| | 14 | A    That could be, we might have done the whole |
| 12:09 | 15 | thing at the same time. |
| | 16 | Q    All right.  And here's my question.  I'm not |
| | 17 | trying to change the record, the record speaks for |
| | 18 | itself.  My question is:  Do you recall discussing the |
| | 19 | IDS or any of the documents on the IDS with the examiner |
| 12:09 | 20 | during this interview? |
| | 21 | A    Yes. |
| | 22 | Q    And which items on the IDS do you have specific |
| | 23 | recall of having discussed with the examiner during the |
| | 24 | interview? |
| 12:10 | 25 | A    Well, my memory becomes a little shaky at this |

point, but I remember we talked about the journal

2 articles, we very well could have talked about the Bari

3 article, the work he did at that time.

4 Q The journal article, which one by number is

12:10 5 that? Which one are you referring to?

6 A I'm talking about Piton and Mullan.

7 Q All right, let's see --

8 A Mullan is 17.

9 Q 17, all right.

12:10 10 A Piton is 21.

11 I have a vague recollection about talking about

12 Sawyer, 20, that Guido talked about it; maybe -- and

13 other ones, and some of the patents too.

14 Q Am I correct that you have similar vague

12:11 15 recollection that item 14 was discussed?

16 A Yeah, yeah, it was all part and parcel of the

17 history of the technology, because the Bari paper's

18 really cumulative with Piton.

19 Q But it was specifically discussed with the

12:11 20 examiner on that date?

21 A Guido discussed the evolution of his work, and

22 that would have been it. But my memory is very vague on

23 this, I -- and I don't think too terribly reliable. But

24 it's -- I can't exclude it. It would have made a lot of

12:12 25 sense to me, you know, but at this -- when I say that,

1    I'm obviously speculating.

2          But we discussed all the references that we

3    regarded as material.  But, you know, Guido would have a

4    better memory of this than perhaps that I did, since I

5    didn't -- I wasn't the one who gave the presentation.

6          MR. SKILTON:  And just for the record, the --

7    and this is not directed at you, Mr. Dawes.  We do

8    request a copy of the PowerPoint presentation in

9    whatever form it presently exists, if it exists, but I

10   want the record to be manifestly clear that we are

11   making that request.  And to my --

12         MR. SCHWILLINSKI:  I would -- just so the

13   record is not empty on this, I would state -- I can

14   speak at least for Boston Scientific and Target -- that

15   efforts have been made to try to find that, and we

16   haven't.  To my knowledge, it hasn't been recovered

17   unless it's somewhere buried in the production.

18         MR. SKILTON:  And I do -- I make no attack

19   here, I just want to make a clear record that the

20   request has been made without equivocation and without

21   lack of clarity as to what I'm talking about.

22      Q    Now, do you recall, without regard to whether

23   the paper itself was discussed, a discussion of the word

24   "rottura" and its proper translation during this

25   meeting?

120

A     No.

2     Q     Do you recall a discussion concerning the

3     English translation of the phrase that included the word

4     "decomposition" with the asterisk footnote that we just

went over?

6     A     During the interview with the examiner?

7     Q     Yes, sir.

8     A     No.

9     Q     Is it that you simply don't recall whether or

not this discussion occurred or that it did not occur?

11     A     I don't recall the issue ever coming up.  And

12     we would have -- that would have been very unlikely that

13     we discussed that kind of detail.  We were more

14     discussing more generally the technology than the

documents.

16     Q     Did he describe his 1982, '83 Italian

17     experiments in this presentation, the same experiments

18     that are described in the Bari paper?

19     A     The 1982, '83 experiments as being the Bari

experiments?

21     Q     Yes, sir.  Well, the experiments that were

22     reported in the Bari paper.

23     A     Yes, I understand.  I believe so, yes.  That

24     was -- he --

Q     Did he -- I'm sorry, go ahead, finish your

answer.

2      A    He talked about his research.

3      Q    Right.  Did he talk about having caused

4 aneurysms to be formed in rabbits in 1982 at the

12:15 5 University of Rome?

6      A    I don't recall that specific detail.  It's

7 possible, yes.

8      Q    Did he talk about the experiments which

9 introduced an electrode into that aneurysm for the

12:15 10 purpose of trying to create electrothrombosis in that

11 interview with that examiner on that day?

12      A    I'd have to give the same response.

13      Q    You don't recall?

14      A    I don't have now that specific recollection,

12:15 15 but I cannot exclude that that subject matter at that

16 detail could have been at some level presented and

17 referenced, yes.

18      Q    At any time during your attempt to locate and

19 produce relevant documents -- and I include now the

12:16 20 first cut when you turned over your files -- did you

21 specifically look for any information relating to the

22 October 6, 1997 interview with the examiner?

23      A    Yes.

24      Q    And did you specifically look for whether or

12:16 25 not you had a hard copy of the slide presentation?

122

A     Yes.

2     Q     And I want to refer you, then, up to a portion

3   of that document beginning at 786, and most particularly

4   to remarks.  Again, when you get there, I'll ask you a

13:45 5   question.

6     A     Okay.

7     Q     Did you draft this portion of the document?

8     A     Yes.

9     Q     Now, referring you to the paragraph that

13:45 10   begins, "Enclosed," "Enclosed are references which have

11   come to the attention of applicant but which have not

12   been previously considered by the office in connection

13   with the invention."  That's your sentence?

14     A     Yes.

13:46 15     Q     And does that sentence refer to the IDS

16   references?

17     A     I would presume so, yes.

18     Q     And what did you mean by "which have come to

19   the attention of applicant"?

13:46 20     A     That I have recently become aware of them.

21     Q     You being the patent lawyer?

22     A     Right.

23     Q     "Applicant," however, includes Dr. Guglielmi,

24   doesn't it?

13:46 25     A     Technically.  It's kind of an editorial term

typically used in patent applications.

2    Q    Well, you would agree with me that

3    Dr. Guglielmi certainly had been well aware of his own

4    Bari article well before this document was filed?

13:46    5    A    Yeah, that's obvious, so "applicant" really

6    means undersigned in this context because of that

7    obvious fact.

8    Q    Now, reading on, "Exhibit 1, Guglielmi, is a

9    translation and the Italian original of a published

13:47    10    article by the inventor relating to the formation of

11    occlusions by electrothrombosis."  Here you're

12    referring, are you not, to the Bari article?

13    A    Yes.

14    Q    And the translation?

13:47    15    A    Yes.

16    Q    And the next sentence then reads as follows:

17    "Exhibit 1 is distinguished from the claims for showing

18    the electrolysis of a relatively inflexible and short

19    steel wire in an aneurysm without any separable distal

13:47    20    tip."  You wrote that?

21    A    Yes.

22    Q    You were able to make that statement based on

23    the English translation of the Bari paper; isn't that

24    correct?

13:48    25    A    Yes, together with an explanation of it from

1

2

3

4          I, the undersigned, a Certified Shorthand

5     Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7     before me at the time and place herein set forth; that

8     any witnesses in the foregoing proceedings, prior to

9     testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is an accurate

13    transcription thereof.

14          I further certify that I am neither

15    financially interested in the action nor a relative or

16    employee of any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19
      Dated: _____ MAY 2 3 2005 _____
20

21

22          _____
                    PEGGY BROGNA
23                  CSR No. 4512

24

25