1  LERACH COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
2  JOHN J. STOIA, JR. (141757)
   THEODORE J. PINTAR (131372)
3  HELEN I. ZELDES (220051)
   RACHEL L. JENSEN (211456)
4  655 West Broadway, Suite 1900
   San Diego, CA 92101
5  Telephone: 619/231-1058
   619/231-7423 (fax)
6  jstoia@lerachlaw.com
   tpintar@lerachlaw.com
7  hzeldes@lerachlaw.com
   rjensen@lerachlaw.com
8
   Attorneys for Plaintiff Friou P. Jones
9
   [Additional counsel appear on signature page.]
10
                    UNITED STATES DISTRICT COURT
11
                   NORTHERN DISTRICT OF CALIFORNIA
12
                          SAN JOSE DIVISION
13

14  FRIOU P. JONES, on Behalf of Himself ) No.
    and All Others Similarly Situated,    )
15                                         ) COMPLAINT FOR:
                            Plaintiff,     )
16                                         ) 1. Violations of the Racketeer
           vs.                             )    Influenced and Corrupt
17                                         )    Organizations Act ("RICO");
    CONSECO INSURANCE COMPANY, )
18  an Illinois company f/k/a CONSECO      ) 2. Financial Elder Abuse, Cal. Welf. &
    ANNUITY ASSURANCE COMPANY, )              Instit. Code §15600;
19                                         )
                            Defendant.     ) 3. Violation of Cal. Bus. & Prof. Code
20  _____ )    §17200 *et seq*;

21                                            4. Violation of Cal. Bus. & Prof. Code
                                                 §17500 *et seq*;
22
                                              5. Fraudulent Concealment, Cal. Civ.
23                                               Code §1710 *et seq*.;

24                                            6. Breach of the Duty of Good Faith
                                                 and Fair Dealing; and
25
                                              7. Unjust Enrichment and Imposition of
26                                               Constructive Trust

27                                            DEMAND FOR JURY TRIAL

28                                            CLASS ACTION

Plaintiff Friou P. Jones ("plaintiff" or "Mr. Jones"), by and through his attorneys, brings this action against Conseco Insurance Company (formerly known as Conseco Annuity Assurance Company) ("Conseco" or "defendant") on behalf of himself and all other similarly-situated senior citizens (persons 65 and older). Plaintiff alleges upon information and belief, as well as the investigation of counsel, as follows:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331-32 and 18 U.S.C. §1964.  This Court has personal jurisdiction over defendant pursuant to 18 U.S.C. §1965(b) and (d).  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.  The amount in controversy exceeds $75,000 for plaintiff, exclusive of costs and interest.  Furthermore, the aggregate amount in controversy for this class action exceeds $5,000,000, and less than one-third of all Class members reside in California.  *See* Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332, Pub. L. 109-2, 119 Stat. 4 (2005).

2.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b) because Conseco maintains offices, has agents and is licensed to and does transact business here.  Venue is also proper under 18 U.S.C. §1965(a) because Conseco transacts substantial business in this District.[1]   Additionally, the related action of *Hansen v. Conseco Insurance Company*, Case No. 5:05-cv-04726, is pending before the Honorable Ronald M. Whyte in this division of the United States District Court, Northern District of California.

---

[1]     According to A.M. Best Company's 2005 Report, the geographic direct premium distribution for Conseco is: California (21.2%); Florida (9.7%); Ohio (5.8%); Michigan (4.9%); Illinois (4.8%); and other jurisdictions (53.7%).  Over the past five years, Conseco has collected over $400 million in premiums from sales of its annuity products to customers in California.

**INTRODUCTION**

3.     This class action challenges defendant's unlawful and unethical scheme to fraudulently solicit, market, sell and issue deferred annuity policies to senior citizens in California and nationwide.  Defendant targets the elderly, including the 81-year-old plaintiff, as prospective purchasers of deferred annuities even though they are unlikely to receive any benefit from the annuity because the holding period, i.e., the period of time during which an annuitant cannot choose to and begin receiving payments from the annuity's accumulated value without being subject to a penalty, or the maturity date, i.e., the date on which income payments will begin, exceeds their actuarial life expectancy.  By and through its network of affiliated sales and marketing agents, defendant turns a blind eye while elderly individuals are persuaded into consolidating their savings and other investments into deferred annuities that tie up their money for years, carry exorbitant "surrender charges," create the likelihood of early withdrawal or surrender thus subjecting the owner to undisclosed tax penalties and create complicated estate problems for their loved ones after their death.

4.     Plaintiff brings this nationwide class action on behalf of himself and all other senior citizens who have purchased a fixed or indexed deferred annuity solicited, referred, marketed, sold and/or issued by defendant Conseco and any of its Affiliated Agents, and/or who have suffered or could suffer a penalty and/or surrender charge, including those incurred on death, for accessing their money during the minimum holding period or before its maturity date (the "Class" or "Class Members").

5.     Conseco markets and sells its deferred annuity products on a national basis primarily through a network of Independent Marketing Organizations ("IMOs") and individual sales agents (collectively referred to herein as "Affiliated Agents"). Conseco utilizes IMOs to target senior citizens in sales of its deferred annuities in California and throughout the United States.  The IMOs hire and manage groups of independent sales agents, who are trained solely to sell Conseco annuity products. The IMOs also systematically solicit, market and sell deferred annuities to seniors,

using fraudulent and deceptive sales tactics and methods, such as offering "free financial and estate planning advice," including living trust mills, to induce their trust, obtain personal financial information and persuade them to convert their savings and other investments such as 401(k)s, 403(b)s, IRAs, CDs and life insurance policies into deferred annuities. Defendant profits from this scheme by collecting premiums, inadequately disclosed commissions and expensive surrender charges from annuity sales that would not occur but for the deceptive, fraudulent and illegal conduct of Conseco and Affiliated Agents described herein.

6. To stimulate sales production, Conseco offers sales incentives, commissions and other promotions to Affiliated Agents for selling Conseco deferred annuity products. Conseco does so even though it is aware of the unsavory tactics used by the Affiliated Agents (e.g., financial seminars, estate planning and living trust mills) to coerce vulnerable elderly victims into buying deferred annuities. Conseco, through its headquarters in Illinois, prepares, disseminates and approves uniform information, illustration and sales materials to Affiliated Agents for marketing and selling its deferred annuities to unsuspecting senior citizens. And, in concert with the Affiliated Agents, Conseco systematically misrepresents that such annuities are appropriate investments for seniors, while downplaying the substantial drawbacks, including massive surrender charges, in violation of state disclosure requirements and consumer protection laws.

7. Conseco has also repeatedly failed to disclose, in the standard form annuity contracts, sales illustrations and related marketing materials, all material facts necessary to inform senior citizens of the true risks and unsuitability of these products and have failed to properly train and supervise the Affiliated Agents about state law and Conseco's internal policies and procedures in connection with the sale of deferred annuities to senior citizens. In addition, Conseco and Affiliated Agents have failed to disclose the full extent of their business relationships and therefore, plaintiff and the Class are unaware of the conflict of interest created by these relationships.

8. Defendant's sales practices alleged herein violate the federal Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq.*, and California elder abuse and consumer protection statutes. *See* Cal. Welf. & Inst. Code §15600 *et seq.*; Cal. Bus. & Prof. Code §§17200 *et seq.*, 17500 *et seq.* Defendant's practices also constitute fraudulent concealment, bad faith, and unjust enrichment warranting a constructive trust.

9. This action seeks to enjoin Conseco from engaging in its unethical and unconscionable sales practices, including the form and substance of such disclosures. It also seeks to compensate the elderly victims of its scheme and penalize Conseco for its knowingly wrongful practices.

## PARTIES

10. Plaintiff Friou B. Jones currently resides in Sarasota, Florida. In 2003, Peter Cataldo, a duly-appointed Conseco sales agent, solicited, offered, and sold Mr. Jones a flexible premium deferred annuity underwritten and issued by Conseco. At the time of the purchase, Mr. Jones was 81 years old.

11. Defendant Conseco Insurance Company, a wholly-owned subsidiary of Conseco, Inc., is organized and existing under and by virtue of the laws of the State of Illinois and is authorized to, and in fact does, transact substantial business in the State of California and within this judicial district. Conseco Insurance Company maintains its executive offices at 222 Merchandise Mart Plaza, Chicago, Illinois, 60654. Prior to 2004, defendant was known as Conseco Annuity Assurance Company.

## FACTUAL ALLEGATIONS

**Deferred Annuity Policies**

12. An annuity is a contract between an annuity owner (or "annuitant") and an insurance company pursuant to which the annuity owner makes an upfront lump-sum payment or a series of payments to the insurance company. The insurance company, in turn, agrees to make payments to the annuity owner over a period of time. With a standard or "immediate" annuity, the annuitant has a right to a stream of

income via payments from the insurance company that is usually guaranteed to last for as long as the annuitant is alive. This provides security to annuitants who are concerned they may outlive their assets.

13. With a deferred annuity, the annuitant foregoes payment until some point in the future, which is determined by the annuity's maturity date or minimum holding period. A deferred annuity has two periods: the accumulation period and the payout period. During the accumulation period, the earnings on the annuitant's premium payments grow, tax-deferred, for as long as the owner leaves the earnings in the annuity. During the payout period, the annuity company pays income to the annuitant or designated beneficiary of the annuity income. Thus, deferred annuities are very different from immediate annuities and provide a long-term investment vehicle, not an up-front income stream. The annuities at issue in this action are deferred annuities.

14. There are at least two kinds of deferred annuities: a "fixed" deferred annuity and an "equity-indexed" deferred annuity.

(a) A "fixed" annuity is an annuity in which the insurance company offers a guaranteed interest rate for a set period of time on the annuitant's premium payments.

(b) An "indexed" annuity is an annuity for which the rate of interest the company provides to the policyholder fluctuates depending upon the performance of a stock market index, such as the S&P 500. The amount of interest credited to an equity-indexed annuity also depends on several other factors, including the term (the period over which the annuity interest is calculated), participation rate (amount of the increase in the index that will be used to calculate the interest), cap rate (an agreed-upon rate which limits the maximum interest rate), floor rate (minimum interest rate), whether the annuity utilizes averaging (determining the interest rate by averaging the index's performance over the term of the annuity) and whether the annuity utilizes compound or simple interest. In short, equity-indexed annuities are complex

derivative products, and consequently lend themselves to abusive sales practices directed toward senior citizens who are unsophisticated investors.

15. With a deferred annuity, the annuity owner cannot withdraw his or her investment or the earned interest until the holding period expires or the deferred annuity matures, which is usually between 10 and 20 years after the initial payment of the premium.

16. The penalty for early withdrawal of either the principal or earnings is called a "surrender charge." The percentage of the surrender charge, which can start as high as 20% or more, declines after a period of five to eight years, and then diminishes further with each passing year for a specified number of years. The surrender charge is often a hefty penalty discouraging early withdrawal of principal from an annuity or early annuitization (a choice by the annuity owner to being receiving regular payments from the annuity). As a result, the terms of deferred annuities severely limit senior citizens' access to their funds for emergencies or cash flow purposes.

17. Defendant represents that its deferred annuities are beneficial because the principal and the interest they accrue is tax-deferred prior to withdrawal. After that deferral period, it is taxed at ordinary income tax rates. This may be beneficial to an annuity owner who is currently working and, therefore, paying income tax. A deferred annuity does not typically benefit a senior citizen, however, because they are already retired and, therefore, not paying as much in income taxes, if at all.

18. Moreover, the deferred annuity is not appropriate for senior citizens who often need to have access to the principal or earnings prior to the maturity date or expiration of the holding period due to medical expenses, assisted living cost and otherwise. Most importantly, deferred annuities are inappropriate for senior citizens because the investment does not mature or the settlement options do not fully vest within the senior citizen's lifetime. Defendant and Affiliated Agents know this is the

case and initially target the elderly, like plaintiff and the Class, in order to reap massive surrender charges prior to policy maturity.

**State Law and Regulators Warn Against Selling Deferred Annuities to the Elderly**

19.     Governmental regulators, insurance regulations, industry standards and internal corporate policies all expressly recognize the unsuitability of deferred annuities as investments for persons aged 65 and older.

20.     For example, in California, the legislature has enacted senior citizen protection statutes relating specifically to the types of policies at issue here, due to the lack of flexibility inherent in deferred annuities, coupled with the diminishing resources of the elderly.  These provisions (codified at California Insurance Code §785 *et seq.*) impose a duty of honesty, good faith and fair dealing on insurers when selling deferred annuity products to senior citizens, prohibit "churning" and similar sales practices and dictate strict disclosure requirements to ensure the suitability of a deferred annuity for the senior citizen's needs.  The Florida legislature has taken similar action to protect seniors by enacting legislation that imposes a duty on insurance companies and agents offering annuity products to seniors over the age of 65 to clearly document the basis for selling the product.  *See* Fla. Stat. §627.4554.

21.     Further, under California Insurance Code §1631, only licensed insurance agents may solicit, offer and sell deferred annuities.  This licensing requirement guarantees that consumers receive appropriate guidance when purchasing a deferred annuity and a level of integrity and accountability.  It also attempts to guarantee that only persons who are required to refrain from misleading the vulnerable consumer will sell these complex products to seniors, subject to regulations and legal duties requiring him or her to disclose all facts and information within the agent's knowledge regarding a marketed insurance product which may be "material" to a prospective annuitant's decision to purchase such products.  *See*, *e.g.*, Cal. Ins. Code §§330, 331, 332, 334.

22. Recently, current California Insurance Commissioner John Garamendi issued a notice to all insurers and insurance agents regarding the use of "unfair marketing and sales tactics designed to accomplish the sale of annuities principally to senior citizens." As Commissioner Garamendi noted, insurers and insurance agents often utilize misleading marketing and deceptive sales schemes, such as portraying themselves as expert financial planners who are acting in the senior's best interests, to lure seniors into purchasing annuities that do not fulfill the senior's retirement needs. In reality (and unbeknownst to the senior), just the opposite is true. He explained:

> Seniors characteristically perceive the agent as a legal advisor or estate planner and not as an insurance agent because the representatives misrepresent themselves as experts in the initial subject area. They gain the trust and confidence of the senior. [sic] and then misuse that trust to sell an annuity that is oftentimes unsuitable for the senior.

> Because of this perception that the salesperson has their best interests in mind, seniors may conclude that they need not totally understand what the pros and cons of an annuity are for their specific situation. They may not be told, or if told they may not understand, the impact of surrender penalties on their net worth, or far-off annuitization dates on their liquidity, or the sale of an annuity or other investment to buy the annuity offered on the taxes they will owe.

Cal. Ins. Commissioner John Garamendi, Notice (Nov. 18, 2005) at 3.

23. Before this notice, in 2002, former California Insurance Commissioner Harry Low issued a Notice to all insurers and insurance agents about using a ruse to "accomplish the sale of annuities that is principally used in the solicitation of senior citizens." The Department of Insurance ("DOI") Notice and warning went unheeded by defendant. Because annuity sales are extremely lucrative (to the tune of *$115.6 billion annually*), Conseco continues to use the Affiliated Agents to do the dirty work of marketing and selling deferred annuities to senior citizens.

24. Florida has also taken steps to curb such abuses. In 2004, Florida's Chief Financial Officer, Tom Gallagher ("CFO Gallagher"), drew attention to these deceitful business practices by warning consumers about such practices. In doing so, CFO Gallagher emphasized the need for the broker or agent to conduct an objective determination as to whether the offered annuity is a suitable investment vehicle for

seniors needing access to their retirement funds: "Annuities can be an effective investment tool for many Floridians wanting a steady stream of income for retirement. . . . But too many of our state's seniors have been preyed upon by agents who are motivated by commission payments, not consideration of a senior's financial circumstances." Along with releasing this warning to seniors, CFO Gallagher took action to protect seniors by pursuing a bill that required insurance companies and agents offering annuity products to seniors over the age of 65 to clearly document the basis for selling the product. Shortly thereafter, that legislation was passed.

25. In addition to warning seniors and insurers about sales of deferred annuity products, states have also recognized that certain marketing methods utilized by insurers and their agents are fraudulent and deceptive. The Pennsylvania Attorney General drew attention to living trust mill scams in July 2001, saying:

> Unfortunately, when it comes to living trusts, unscrupulous con artists are ready to play on consumers' fears of the unknown. In some cases, consumers – mostly elderly – are solicited by phone or mail to attend seminars or to set up in-home appointments to discuss living trusts. Living trusts are then marketed through high-pressure sales pitches which prey on the fear that assets will be tied up indefinitely or that estates are prone to heavy taxes and fees if a living trust is not in place. Con artists often rely on unfamiliar terms such as "probate" and "executor" to convince consumers that a living trust is right for them even though many of the complex rules and fees that can complicate estate distributions do not exist in Pennsylvania.

> Sometimes victims are sold worthless "kits", costing several thousand dollars, which are nothing more than standard forms that may or may not be valid, as laws concerning living trusts vary from state to state. In other cases, false promoters simply want to gain access to consumers' financial information so they can sell them other products like insurance annuities.

26. It is not only the policymakers and the regulators, but the industry itself that also recognizes the problems in marketing and selling deferred annuities to senior citizens. On May 27, 2003, the National Association of Securities Dealers ("NASD") – the security industry's self-regulatory body – issued an alert about the marketing and sale of deferred annuities, especially to the elderly. "The marketing efforts used by some variable annuity sellers deserve scrutiny – *especially when seniors are the*

*targeted investors*." (Emphasis added.) In its alert, the NASD acknowledged: "The variety of features offered by variable annuity products can be confusing. For this reason, it can be difficult for investors to understand what's been recommended for them to buy – especially when facing a hard charging salesperson." Although the alert focused on variable annuities, it applies equally to other deferred annuities.

**Defendant's Scheme to Sell Deferred Annuities to Senior Citizens**

27. Despite these warnings, defendant continues to solicit, market, sell and underwrite deferred annuity policies targeting the elderly, including plaintiff and the Class. Unbeknownst to plaintiff, Conseco offers sales incentives, commissions and other promotions to Affiliated Agents for selling seniors Conseco deferred annuity products. Conseco, in turn, receives immense profits and maintains or increases market share from the sale of deferred annuities to seniors.

28. Conseco ignores numerous states' policy and regulatory warnings, and as a business practice, turns a blind eye toward the unscrupulous tactics used by the Affiliated Agents to sell its products, and routinely issues age limit exceptions to generate tremendous profits. On information and belief, Conseco also approves or ratifies Affiliated Agents' misleading and deceptive marketing plans and ruses designed to target senior citizens. They do so despite numerous warnings and actions by governmental entities showing that this is an unlawful and unacceptable business practice, because of the massive profits and commissions earned by defendant.

29. Defendant's common course of conduct and scheme include a number of players and shifty machinations calculated to defraud or otherwise take advantage of the elderly. Defendant encourages Affiliated Agents to garner the trust of seniors and their confidential and personal financial information, and in turn manipulate them into buying a deferred annuity.

30. For example, as defendant is aware, Affiliated Agents target seniors in advertisements for financial, retirement, long-term care, and estate planning seminars and workshops that are publicized in mass mailings and an array of newspapers.

These meetings are hosted by Affiliated Agents and held in seniors' homes, hotels, senior centers, and other locations. As part of defendant and Affiliated Agents' scheme, service providers misrepresent that they offer bona fide legal, accounting, and other types of objective advice for financial and/or estate planning, when, in fact, they merely seek to sell the senior a deferred annuity.

31. Defendant trains individual sales agents to target senior citizens by offering such financial or estate planning as community service events for the elderly. Upon information and belief, defendant also instructs sales agents to use these meetings to lure seniors into providing confidential financial information. Defendant provides standardized or approved forms to sales agents for eliciting confidential and sensitive information about the seniors' assets under the guise of gathering the requisite information for preparing other financial or legal documents. The Affiliated Agents then use this information to determine whether a given senior is a viable target for their deceptive sales scheme (known within the industry as "prospecting"). Based upon the training given to them by defendant, Affiliated Agents then focus additional marketing efforts on those seniors they have identified as viable targets through this scam.

32. Defendant also encourages its agents and brokers to attend annuity workshops, where, in addition to learning how to lure seniors into attending disguised trust mills, Affiliated Agents learn how to maximize their sales commissions (and defendant's profits) through unscrupulous sales practices. One common technique, called "pushing the hot-button," involves exploiting a senior's emotional insecurities and financial concerns in order to generate interest in the agent's annuity products. Under this technique, an agent will first gather a senior's financial information under the guise that such information is necessary to provide sound financial advice. Then, after purportedly studying the senior's financial information, the agent will generate fear in the senior by creating so-called problems, even though none truly exist. For example, an agent may tell the senior that their finances are in disarray or that the

senior lacks adequate asset protection and could easily have his or her life savings seized –leaving them penniless.  To complete the ruse, the agent conveniently provides the senior with the solution to their fear: an annuity that, unbeknownst to the senior, generates thousands of dollars in commissions for the agent and does nothing to ensure the senior's financial safety.

33.    Senior citizens are an ideal target for defendant's scheme and are particularly susceptible to these deceptive and misleading practices.  Many seniors have a diminished ability to understand complex investment transactions, harbor concerns about risky investments, and fear outliving their assets.  Defendant pursues senior citizens with sales tactics designed to scare, deceive, coerce, harass and/or force them into converting their assets and investments into deferred annuities.

34.    Defendant and Affiliated Agents collude in targeting the elderly and coordinate the exchange of private financial and personal information of intended victims.  As defendant encourages, Affiliated Agents develop profiles of particular individuals based on age, available assets, and predicted vulnerability.  Affiliated Agents arrange to share information, documentation, advertising and promotional materials with other co-conspirators so that they, in turn, can provide it to targets for inducing reliance and trust based on the name and reputation of Conseco.

35.    The Affiliated Agents have agreements with Conseco to sell its deferred annuities, and they adhere to the sales procedures, protocols and materials dictated, prepared and/or approved by Conseco.  These sales protocols and procedures include the use of standard annuity marketing materials, illustrations and form contracts created and/or authorized by Conseco.  Conseco instructs the Affiliated Agents not to elaborate on the information presented in its form annuity contracts, the form "Notice to California Residents Age 65 or Older," and uniform pre-printed sales illustrations and marketing materials when making a sales presentation to prospective customers.

36.    Upon information and belief, Conseco has changed its agent training protocols and agent supervision and reporting practices in recent years such that it no

longer adheres to statutory obligations in selling deferred annuities to seniors. At the same time, Conseco has increasingly relied on independent agents/brokers, such as Peter Cataldo ("Cataldo"), and IMOs to market and sell its equity-indexed deferred annuities. This has undercut Conseco's ability to properly train and supervise its brokers and agents such that it no longer ensures Affiliated Agents fully disclose all material information about its deferred annuity products to consumers at the point of sale. Further, upon information and belief, Conseco turns a blind eye to complaints about Affiliated Agents and fails to take appropriate corrective and/or disciplinary action.

37. Conseco fails to make any review or good faith effort to ascertain or verify the suitability of its deferred annuity products for senior citizens. Conseco fails to require sales agents to issue an age exception prior to issuing a policy to senior citizens. Thus, Conseco fails to do its due diligence to prevent misleading or incomplete sales presentations to seniors about the deferred annuity products.

38. Conseco pays the Affiliated Agents, including Cataldo, bonuses and unusually high commissions for targeting and selling deferred annuities to senior citizens. By doing so, Conseco induces, condones and encourages Affiliated Agents to engage in aggressive and predatory marketing tactics, including targeting and exploiting the vulnerability and concerns of senior citizens. For example, with the knowledge and at least tacit approval of Conseco, the Affiliated Agents persuade senior citizens to convert their savings or liquidate other investments such as 401(k)s, 403(b)s, IRAs, CDs and life insurance policies into Conseco deferred annuities, often resulting in surrender charges incurred for accessing the senior's money after purchasing Conseco's products.

39. Defendant engages in various deceptive sales techniques designed to mislead senior citizens regarding the purported benefits and advantages of annuities compared to other forms of investments, and have concealed or downplayed the disadvantages of purchasing a deferred annuity in later stages of life. Defendant's

marketing materials mislead seniors by not adequately disclosing the hefty surrender charges that remain in effect for the first 10-15 years of the annuity and by not adequately disclosing that the maturity date or full vesting of the settlement options is beyond the actuarial life expectancy of the annuitant.

40. Defendant's marketing materials also mislead seniors by disguising the fact that purchasers of indexed deferred annuities can have 0% returns in a given year. Instead, defendant's marketing materials falsely proclaim that indexed deferred annuities are a risk-free investment because the deferred annuity contract provides for a guaranteed minimum account value. Defendant's marketing materials do not disclose, however, that the guaranteed minimum account value does not exceed the premiums paid for many years, and that a policyholder must not surrender the policy for a significant period of time before the guaranteed minimum account value will protect against the risk of losing money.

41. Conseco's contracts are intentionally drafted so that the average person, let alone an elderly person, cannot readily understand the terms. Mr. Jones' annuity, for example, presents him with a raft of confusing settlement options and fails to adequately explain that these options will not fully vest for five years. In addition, Affiliated Agents attempt to conceal the provisions that render the deferred annuity inherently unsuitable for seniors, e.g., harsh surrender penalties and limits on withdrawals.

**Mr. Jones Purchases a Conseco Deferred Annuity**

42. In 2003, Mr. Jones received an unsolicited advertisement from Mr. Peter Cataldo. In the advertisement, Cataldo advertised himself as a "Licensed Consultant." As such, Cataldo represented that he could provide objective financial advice and/or estate planning for seniors such as Mr. Jones. Cataldo asked Mr. Jones if he would like to "stop paying income taxes on [his] savings dollars?"

43. After receiving the solicitation, Mr. Jones made an appointment for personalized financial planning and arranged to meet with Cataldo. At the meeting,

Mr. Jones expressed concern over an Allianz annuity he currently owned. Because his existing Allianz annuity required annuitization at age 89, it would not provide the immediate income that he and his wife needed for retirement.

44.     Mr. Jones offered a purported solution: a Conseco "Hallmark Marquee Flexible Deferred Annuity." To finance the purchase of the Conseco annuity, Cataldo suggested that Mr. Jones raid the cash value of the existing Allianz annuity. Mr. Jones expressed reservations about the transaction because he did not want to pay the surrender charges associated with the existing Allianz policy. Cataldo, however, was determined to make the sale. He told Mr. Jones that the interest earned on the new Conseco annuity would more than offset the surrender charges. In fact, Mr. Jones lied about the interest guaranteed by the Conseco policy, telling Mr. Jones that his initial premium payment would grow at 6% for the first three years.

45.     Based on Cataldo's representations, Mr. Jones agreed to surrender his existing Allianz policy and purchase the Conseco deferred annuity. The Conseco annuity number is 0N7XXXXX.[2] The policy has a minimum holding period of five years, which requires Mr. Jones to live to be 86-years old before the settlement options fully vest. Should Mr. Jones choose to begin receiving payments under one of the settlement options within five years of purchase or choose a settlement option providing for payments for a period of less than five years, the balance of the annuity and the payments therefrom will be subject to penalties and/or massive surrender charges. Furthermore, should Mr. Jones choose to withdraw the entire sum within nine years of purchase, he will be subject to the same surrender charges.

46.     At no time during the meeting did Cataldo make an objective determination as to whether the deferred annuity was suitable for Mr. Jones. Rather, Cataldo focused on the extent of Mr. Jones' retirement assets, including the Allianz

---

[2]     "XXXXX" inserted for privacy purposes.

annuity already held by Mr. Jones, and how such assets could be used to fund the Conseco policy. Accordingly, Mr. Jones received a deferred annuity that did not suit his financial needs, locking up much-needed income for years by imposing hefty surrender charges on payments received under the settlement options and any lump sum withdrawal until Mr. Jones reached the ages of 86 and 91, respectively.

47. Likewise, at no time during the meeting did Cataldo disclose to Mr. Jones that the "Hallmark Marquee" annuity sold to him had a minimum holding period of five years, meaning that the income payments would be subject to steep surrender charges if Mr. Jones chose to annuitize the policy within five years of purchasing the annuity.

48. Shortly after purchasing the policy and realizing that Cataldo had misrepresented the key terms of the annuity, Mr. Jones submitted complaints about Cataldo to both Conseco and the Florida Department of Financial Services ("DFS"). Mr. Jones sought recission of the annuity or a credit to the accumulated value of the annuity equal to the agreed-upon 6% interest for three years. Conseco steadfastly refused even though it acknowledged in its responsive report to the Florida DFS that Cataldo appeared to have misrepresented, in writing, the terms of the Conseco annuity to Mr. Jones.

49. From solicitation to purchase, as aforementioned, Cataldo represented that he provided objective and expert financial planning advice specially tailored to meet the needs of seniors, including Mr. Jones. He represented that he had the experience and qualifications necessary to provide this advice and to serve Mr. Jones' best interests. Based on these representations, Mr. Jones believed Cataldo was giving him objective financial advice, and he relied on that advice to his detriment.

50. According to the National Center for Health Statistics, the average life expectancy of a male is approximately 77 years. Thus, Mr. Jones had lived out his life expectancy when he purchased the Conseco annuity.

51.     As a result of the Conseco deferred annuity he purchased, Mr. Jones has suffered damages in lost access to needed funds, paying unnecessary fees and charges to sales agent Cataldo, and foregoing other investments that would have faired better.

**RICO ALLEGATIONS**

52.     Conseco and Affiliated Agents have engaged in a fraudulent scheme, common course of conduct and conspiracy, to increase or maintain market share and premium revenue for Conseco and revenues for the Affiliated Agents from extremely lucrative commissions.

53.     To achieve these goals, defendant entered into agreements to sell deferred annuity policies to senior citizens, used and disseminated virtually uniform marketing materials to solicit and sell such policies and paid commissions and other fees for accomplishing a sale.    As a direct result of defendant and Affiliated Agents' conspiracy and fraudulent scheme, Conseco was able to extract premiums, fees, early withdrawal penalties, and other revenues from Mr. Jones and the Class.

**Elder Abuse Annuity Enterprise**

54.     Based upon plaintiff's current knowledge, the following constitute one or more groups of persons and entities associated in fact, hereinafter referred to in this Complaint as the "Elder Abuse Annuity Enterprise" or the "EAA Enterprise": defendant and Affiliated Agents, including, but not limited to, Mr. Cataldo.

55.     The EAA Enterprise is an ongoing and continuing organization consisting of both corporations and individuals associated for the common or shared purpose of selling, promoting and/or marketing deferred annuity policies to plaintiff and the Class through deceptive and misleading sales tactics or materials, and deriving profits from those activities.

56.     The EAA Enterprise functions by providing financial, long-term care or estate planning, consultation, advice and related services, as well as insurance products.    Many of these services and products are legitimate and non-fraudulent. However, defendant and Affiliated Agents, through the EAA Enterprise, have

engaged in a pattern of racketeering activity which also involves a fraudulent scheme to increase premium revenue for Conseco, and additional revenue for the Affiliated Agents from commissions, through the sale of deferred annuities to senior citizens.

57.    The EAA Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the marketing, promotion, advertisement and sale of inappropriate deferred annuity products to seniors, and the receipt of premiums, commissions, and surrender charges from the sale of inappropriate deferred annuity products to senior citizens.

58.    Within the EAA Enterprise, there is a common communication network by which co-conspirators share information on a regular basis.  The EAA Enterprise uses this common communication network for the purpose of marketing, soliciting and selling annuity products to the general public, including senior citizens.

59.    The EAA Enterprise has a systematic linkage because there are contractual relationships, financial ties and continuing coordination of activities. Through the EAA Enterprise, defendant and Affiliated Agents engage in consensual decision making to implement their fraudulent scheme and to function as a continuing unit for the common purpose of exacting payments, surrender charges and premium dollars.  Furthermore, the EAA Enterprise functions as a continuing unit with the purpose of assisting with, perfecting and furthering their wrongful scheme to market and sell Conseco's deferred annuity products to senior citizens.

60.    While defendant participates in and is a member of the EAA Enterprise, it also has a separate and distinct existence.

61.    Defendant and Affiliated Agents must conceal the inherent properties of deferred annuities to market and sell this inappropriate investment to senior citizens, who are highly unlikely to survive until the settlement options fully vest or the annuity matures.  To limit the substantive information that prospective purchasers receive, defendant has to maintain control over information prospective purchasers get at the

point of sale.  Defendant exercises substantial control over the direction of the EAA Enterprise by:

(a)    designing and issuing deferred annuity products with extended holding periods or maturity dates, high surrender charges and other similar provisions to senior citizens;

(b)    developing uniform sales and marketing materials, standardized annuity contracts, high-pressure sales techniques and scripted sales presentations including, but not limited to, those materials developed by defendant for use by the Affiliated Agents;

(c)    developing uniform sales techniques to "churn" senior citizens into purchasing deferred annuities from Conseco by baiting them to convert current investments to deferred annuities by extolling the high interest rate without disclosing the associated penalties;

(d)    instructing and requiring sales agents to use standardized sales materials, uniform sales techniques and presentations developed and/or authorized by defendant to market and sell unsuitable deferred annuities to senior citizens;

(e)    rewarding sales agents with perks and high commissions for selling a deferred annuity product to a senior citizen;

(f)    accepting applications for and issuing deferred annuities that mature after the actuarial life expectancy of the annuitant; and

(g)    imposing and/or collecting charges from the Class for exercising their right to receive payments under a settlement option prior to the expiration of the holding period, withdrawing some or all of the annuity and/or dying prior to the maturity date.

62.    Although defendant sells immediate annuities or other policies appropriate for senior citizens, the EAA Enterprise has targeted senior citizens specifically for deferred annuity products.

63.     At all relevant times, each participant in the EAA Enterprise was aware of the scheme to induce seniors to purchase inappropriate deferred annuity products, was a knowing and willing participant in the scheme and reaped profits therefrom.

64.     The EAA Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which defendant has engaged.

65.     Defendant has directed and controlled the ongoing organization necessary to implement its scheme and illicit business practices at meetings and through communications about which plaintiff cannot now know because all such information lies in defendant's hands.

**RICO Conspiracy**

66.     Defendant and Affiliated Agents have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy.

67.     Defendant and Affiliated Agents have engaged in a conspiracy to increase or maintain market share and premium revenue for Conseco and to generate additional revenue for Affiliated Agents through high commissions and incentives paid by Conseco for selling deferred annuities to senior citizens.

68.     The objects of the conspiracy are: (a) to induce senior citizens to purchase Conseco's deferred annuity policies; (b) to maximize annuity sales for Conseco; (c) to maximize commissions for Affiliated Agents; and (d) to maximize the revenues of Conseco and Affiliated Agents.

69.     To achieve these goals, Conseco has routinely issued age exceptions for deferred annuities, issued virtually uniform information to the Affiliated Agents for marketing and selling such policies and paid high commissions for the sale of deferred annuities to seniors by any means. The Affiliated Agents have agreed to sell deferred annuities to seniors, even though they are inappropriate investments for them, and they have used deceptive and unconscionable methods to secure such sales and commissions. Defendant and Affiliated Agents have also agreed to participate in

other illicit and fraudulent practices, all in exchange for agreement to and participation in the conspiracy.

70. Defendant and each member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in inducing the trust of elderly citizens, persuading them to consolidate their assets in a deferred annuity, and to solicit, market and sell such policies to persons for whom the investment will provide no benefit, but rather, will cause them harm through steep penalties, complications for loved ones upon their death, tax liability and other costs and expenses.

71. Indeed, for the conspiracy to succeed, defendant and Affiliated Agents had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

72. Many instances of common conduct, activity and similar facts evidence the presence of a conspiracy and exist among defendant and co-conspirators including, but not limited to:

(a) similar advertisements and marketing materials with vague, misleading, and incomplete language about the inappropriateness of deferred annuity policies for seniors;

(b) similar plans and methods for sales agents to solicit, market, refer, and sell Conseco's deferred annuities under the guise of providing financial and estate planning for seniors;

(c) similar tactics for steering the Class to Conseco deferred annuity policies; and

(d) similar agreements between and among defendant and co-conspirators to sell deferred annuity products to seniors, despite industry standards and governmental warnings.

73.     As a result of the conspiracy, Mr. Jones and the Class made payments for deferred annuity products and other "services" beyond what they would have otherwise.

**Use of the Mails and Wires**

74.     Defendant and Affiliated Agents used thousands of mail and interstate wire communications to create and manage their fraudulent scheme through virtually uniform misrepresentations, concealments and material omissions.  Defendant and Affiliated Agents' scheme includes, but is not limited to: false and misleading marketing materials, mass mailings, phone calls, advertisements, agreements, insurance contracts, correspondence, policy materials, Web sites, and commission payments to Affiliated Agents.

75.     Defendant's fraudulent use of the mails and wires included the following communications sent by defendant and Affiliated Agents to each other, plaintiff and third parties via U.S. Mail, commercial carrier, wire, or other interstate electronic media:

(a)     false or misleading representations that Affiliated Agents provide objective financial advice to assist the Class in crafting their financial and estate plans;

(b)     misrepresentations and omissions about the inappropriateness of deferred annuity policies for seniors, as well as the drawbacks of such policies, such as steep penalties for withdrawal prior to the maturity date;

(c)     materials failing to disclose the existence and effect of commissions paid to Affiliated Agents by Conseco, including the conflicts of interest created by the payments and as part of the conspiracy;

(d)     misrepresentations and omissions aimed at inducing plaintiff and the Class to purchase Conseco deferred annuities; and

(e)     invoices and payments related to defendant and Affiliated Agents' improper scheme.

76. Defendant's corporate headquarters have communicated by U.S. Mail and by facsimile with various regional offices and subsidiaries, divisions and other insurance entities in furtherance of its scheme with Affiliated Agents.

77. Defendant's virtually uniform misrepresentations, acts of concealment and omissions were knowing and intentional and made for the purpose of deceiving the Class, selling lucrative deferred annuity policies, and entitling Affiliated Agents to high commissions from Conseco.

78. Defendant and Affiliated Agents either knew or recklessly disregarded that their misrepresentations and omissions were material and were relied upon by plaintiff and the Class as shown by their payments for deferred annuity policies placed with Conseco, as well as other fees for financial planning advice.

**FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING**

79. Defendant has affirmatively and fraudulently concealed its unlawful scheme, conspiracy and course of conduct from plaintiff and the Class. Plaintiff and other Class Members did not know, and could not reasonably have known, of defendant's fraudulent scheme and could not have reasonably discovered the falsity of defendant's representations, advertising and similar documents, nor could plaintiff and the Class reasonably have known the concealed information until shortly before the filing of this Complaint.

80. To this day, defendant continues to fraudulently conceal its practices from the Class and public alike. Defendant has refused to release or provide information about its practices in a way that plaintiff and/or the Class could have discovered its fraudulent scheme and practices. Although the initial decisions to engage in these practices were made years ago, defendant has repeatedly decided since to continue concealing its fraudulent practices.

81. Defendant has uniformly trained its sales force and other representatives not to disclose its fraudulent practices described herein. Defendant did not disclose its

practices in any of its policies or sales and marketing materials provided to plaintiff and the Class.

82.     As a result of the foregoing, plaintiff and the Class could not reasonably discover the unlawful and unethical practices described herein and did not do so until just recently.  The vast majority of Class members still do not know that they have been injured by defendant's conduct.

83.     Defendant's conduct is continuing in nature.  There is a substantial nexus between the fraudulent conduct that has occurred within the statute of limitations and the misconduct prior to that time.  The acts involve the same type of illicit practices and are recurring, continuous events.

84.     The statute of limitations applicable to any claims brought by plaintiff or other Class Member as a result of the conduct alleged herein has been tolled as a result of defendant's fraudulent concealment.

**CLASS ACTION ALLEGATIONS**

85.     Pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3), plaintiff brings this nationwide class action on behalf of himself and all other senior citizens (persons 65 and older) who purchased a fixed or indexed deferred annuity solicited, referred, marketed, sold and/or issued by defendant Conseco and any of its Affiliated Agents, and/or who have suffered or could suffer a penalty and/or surrender charge, including those incurred on death, for accessing their money during the minimum holding period or before its maturity date.

86.     Excluded from the Class is defendant and its directors, officers, predecessors, successors, affiliates, agents, co-conspirator and employees, as well as the immediate family members of such persons.

87.     All Class members have suffered injury to their property by reason of defendant's scheme and unlawful course of conduct, in that they paid for insurance policies that were inappropriate given their age, and that they have or could suffer early withdrawal penalties.

88.     The Class is reasonably estimated to be in the thousands or tens of thousands and is thus so numerous that joinder of all its members is impracticable. The precise number of Class Members and their addresses are unknown to plaintiff, but can be ascertained through appropriate discovery of defendant's records.  Class Members may be notified of the pendency of this action by publication and/or other notice.

89.     There is a well-defined community of interest in the relevant questions of law and fact affecting putative Class Members.  Common questions of law and fact predominate over any individual questions affecting Class Members, including, but not limited to the following:

(a)     whether defendant improperly solicited, referred, marketed, issued or sold deferred annuities to senior citizens, including plaintiff and the Class;

(b)     whether defendant engaged in mail and/or wire fraud;

(c)     whether defendant engaged in a pattern of racketeering activity;

(d)     whether the EAA Enterprise is an "enterprise" within the meaning of 18 U.S.C. §1961(4);

(e)     whether defendant conducted or participated in the affairs of the EAA Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

(f)     whether defendant conspired with Affiliated Agents to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

(g)     whether defendant committed elder abuse as defined in California Welfare and Institutions Code §15600 *et seq*.;

(h)     whether defendant committed unfair, unlawful and/or fraudulent business practices, in violation of California Business and Professions Code §17200, in its marketing, promotion, solicitation, sales and issuance of deferred annuities to plaintiff and Class Members;

(i) whether defendant engaged in false and misleading advertising in violation of California Business and Professions Code §17500 *et seq*.;

(j) whether defendant fraudulently concealed information about deferred annuities from plaintiff and the Class in violation of California law;

(k) whether defendant breached its obligation of good faith to plaintiff and the Class;

(l) whether defendant aided and abetted or ratified the wrongful acts of Affiliated Agents;

(m) whether defendant has been unjustly enriched at the expense of the Class;

(n) whether plaintiff and the Class are entitled to damages; and

(o) whether the Class is entitled to injunctive, declaratory, and/or other relief.

90. The claims of plaintiff and the other Class Members have a common origin and share a common basis. The claims originate from the same illegal, fraudulent conspiracy on the part of defendant and Affiliated Agents and their acts in furtherance thereof, as well as the conduct of their co-conspirators.

91. Plaintiff's claims are typical of those of the absent Class Members. If brought and prosecuted individually, the claims of each Class Member would require proof of many of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

92. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or that directly and irrevocably conflict with the interests of other Class Members. Plaintiff is willing and prepared to serve the Court and the putative Class in a representative capacity with all of the obligations and duties material thereto.

93. Plaintiff has retained the services of counsel, identified below on the signature page, who are experienced in complex class-action litigation and in

particular class actions involving insurance matters. Plaintiff's counsel will adequately prosecute this action, and will otherwise assert, protect and fairly and adequately represent plaintiff and all absent Class Members.

94. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class.

95. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) in that defendant has acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

96. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) in that common questions of law and fact predominate over any questions affecting only individual Class Members.

97. Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

(a) individual claims by the Class Members would be impracticable as the costs of pursuit would far exceed what any one Class Member has at stake;

(b) little individual litigation has been commenced over the controversies alleged in this Complaint, and individual Class Members are unlikely to have an interest in separately prosecuting and controlling individual actions;

(c) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; and

(d) the proposed Class action is manageable.

# FIRST CLAIM FOR RELIEF

## Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(c)-(d)

98.     Plaintiff and the Class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

99.     This claim arises under 18 U.S.C. §1962(c) and (d), which provides in relevant part:

> (c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

100.    In violation of 18 U.S.C. §1962(c), defendant has conducted or participated, directly or indirectly, in the conduct of the affairs of the EAA Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5).

101.    At all relevant times, defendant was a "person" within the meaning of 18 U.S.C. §1961(3), because it was "capable of holding a legal or beneficial interest in property."

102.    The EAA Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in defendant's profit-making scheme.

103.    The EAA Enterprise was created and/or used as a tool to carry out the elements of defendant's illicit scheme and pattern of racketeering activity. The EAA Enterprise has ascertainable structures and purposes beyond the scope and commission of defendant's predicate acts and conspiracy to commit such acts. The EAA Enterprise is separate and distinct from defendant.

104.    The EAA Enterprise has engaged in, and its activities affected, interstate and foreign commerce by soliciting, marketing, referring, selling and issuing deferred annuity policies to thousands, if not tens of thousands, of persons within and without the U.S.

105.    The EAA Enterprise actively disguised the nature of defendant's wrongdoing and concealed or misrepresented defendant's participation in the conduct of the EAA Enterprise to maximize profits while minimizing their exposure to criminal and civil penalties.

106.    Defendant exerted substantial control over the EAA Enterprise, and participated in the operation and managed the affairs of the EAA Enterprise as described herein.

107.    Defendant has committed or aided and abetted the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343, within the past 10 years.  The multiple acts of racketeering activity which defendant committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity and therefore constitute a "pattern of racketeering activity."

108.    Defendant's predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

(a)    **Mail Fraud:** Defendant has violated 18 U.S.C. §1341 by sending or receiving materials via U.S. Mail or commercial interstate carriers for the purpose of executing its scheme to market and sell deferred annuities to seniors by means of false pretenses, misrepresentations, promises and/or omissions. The materials include, but are not limited to: advertisements, deferred annuity marketing brochures, performance illustrations, applications, contracts, sales presentation scripts, training manuals, videotapes, correspondence, annuitant lead lists, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of Conseco's deferred annuities.

(b) **Wire Fraud**: Defendant has violated 18 U.S.C. §1343 by transmitting and receiving materials by wire for the purpose of executing its scheme to defraud and obtain money on false pretenses, misrepresentations, promises and/or omissions. The materials transmitted and/or received include, but are not limited to, those mentioned in subsection (a) above.

109. Many of the precise dates of defendant's fraudulent uses of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to the defendant's books and records. Indeed, the success of defendant's scheme depends upon secrecy, and defendant has withheld details of the scheme from plaintiff and Class Members. Generally, however, plaintiff can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

(a) processing applications for deferred annuity products;

(b) issuing age waivers for applicants over the age of 65 or, alternatively, issuing policies to applicants over the age of 65 without an age waiver;

(c) processing premium payments from senior citizens;

(d) paying and receiving commissions for the marketing, referral and sale of deferred annuity products to a senior;

(e) transmitting and receiving materials about defendant and Affiliated Agents' financial, long-term care and estate planning seminars, workshops and other similar events for senior citizens;

(f) disseminating training materials for selling deferred annuities;

(g) sharing information about prospective purchasers of deferred annuities; and

(h) imposing and processing penalties and surrender charges for early access to funds trapped in the deferred annuity products.

110. The materials sent or received by defendant via the U.S. Mail, commercial carrier, wire or other interstate electronic media, contained, *inter alia*:

(a) misrepresentations that deferred annuity products are suitable for seniors;

(b) misrepresentations or omissions about defendant's unlawful sales techniques, misleading sales materials and annuity contracts to induce plaintiff and the Class to purchase deferred annuities;

(c) misrepresentations about the nature of the relationship between the Affiliated Agents and defendant; and

(d) omissions that Affiliated Agents are not "independent" estate and financial planning services or insurance advisors because they are paid extremely high commissions from Conseco for selling deferred annuities.

111. Defendant knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose so as to deceive plaintiff and the Class. Defendant either knew or recklessly disregarded that these were material misrepresentations and omissions, and plaintiff and the Class relied on the misrepresentations and omissions as set forth herein.

112. Defendant has obtained money and property belonging to plaintiff and the Class as a result of these statutory violations. Plaintiff and other Class Members have been injured in their business or property by defendant's overt acts or mail and wire fraud. Plaintiff and the Class have also been injured in their business or property by defendant aiding and abetting Affiliated Agents' acts of mail and wire fraud.

113. In violation of 18 U.S.C. §1962(d), defendant conspired with Affiliated Agents to violate 18 U.S.C. §1962(c) as described herein. Various other persons, firms and corporations, not named as defendant in this Complaint, have participated as co-conspirators with defendant and Affiliated Agents in these offenses and have performed acts in furtherance of the conspiracy.

114.  Defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§1341 and 1343 offenses pursuant to 18 U.S.C. §2.

115.  Plaintiff and the Class have been injured in their property by reason of defendant's violations of 18 U.S.C. §1962(c) and (d), including lost access to needed funds, unnecessary and concealed fees, charges and penalties that they would not have otherwise incurred, expenses to hire a financial planner and/or attorney and lost value in previous investments that they would not have otherwise incurred.  In the absence of defendant's violations of 18 U.S.C. §1962(c) and (d), plaintiff and the Class would not have incurred these costs and expenses, or they would have incurred less.

116.  Plaintiff and the Class relied, to their detriment, on defendant's fraudulent misrepresentations and omissions, which were made by means of Web sites, mass mailings, newspaper advertisements, telephone calls, marketing materials and virtually uniform representations or omissions.  Plaintiff and the Class's reliance is evidenced by their payments made for services and for insurance products to defendant.

117.  Plaintiff and the Class's injuries were directly and proximately caused by defendant's racketeering activity.

118.  Defendant knew plaintiff and the Class relied on its misrepresentations and omissions about the pricing and advantages or disadvantages about certain insurance policies and/or insurance carriers.  Defendant knew that policyholders would incur substantial costs as a result.

119.  Under the provisions of 18 U.S.C. §1964(c), plaintiff is entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.

120.  Defendant is accordingly liable to plaintiff for three times his actual damages as proved at trial plus interest and attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Financial Elder Abuse, California Welfare & Institutions Code §15600 *et seq.*

121.    Plaintiff and the Class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

122.    Defendant's conduct constitutes financial abuse under California Welfare and Institutions Code §15657.5 *et seq.*, as defined in California Welfare and Institutions Code §15610.30. California Welfare and Institutions Code §15610.30(a) provides in relevant part:

(a)    "Financial abuse" of an elder or dependent adult occurs when a person or entity does any of the following:

(i)    Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

(ii)    Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

123.    At all relevant times, defendant took and/or assisted in the taking of property from Mr. Jones and the Class (who are all age 65 or older) for its own wrongful use and/or with intent to defraud. Plaintiff and the Class trusted and relied on defendant.

124.    Defendant manipulated plaintiff and the Class into purchasing deferred annuities.

125.    Defendant aided and abetted Affiliated Agent in accomplishing the wrongful acts. In doing so, defendant acted with an awareness of its wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct.

126.    In performing these acts, Affiliated Agents either acted as agents of Conseco, or Conseco ratified such acts, or both.

127.    Defendant's conduct was reckless, oppressive, fraudulent and malicious within the meaning of California Welfare and Institutions Code §15657 *et seq.*

128.    Under California Welfare and Institutions Code §15657.5 *et seq.*, defendant is liable for reasonable attorneys' fees and costs for investigating and litigating this claim.

129.    Under California Civil Code §3294 and California Welfare and Institutions Code §15657.05(a), defendant is liable for punitive damages.

130.    Under California Civil Code §3345, defendant is liable for treble damages and penalties because: (a) defendant knew or should have known its conduct was directed as to a senior citizen; (b) its conduct caused a senior citizen to suffer substantial loss of property set aside for retirement, and assets essential to their health and welfare; (c) plaintiff and the Class are senior citizens who are more vulnerable than others to defendant's conduct because of their age, impaired understanding, impaired health or restricted mobility; and (d) plaintiff and the Class actually suffered substantial physical, emotional and economic damages resulting from defendant's conduct.

131.    Under California Welfare and Institutions Code §§15657 *et seq.* and 15657.05 *et seq.*, defendant is liable to plaintiff and the Class for their pain and suffering.

### THIRD CLAIM FOR RELIEF

**Violation of California Business &
Professions Code §17200 *et seq.***

132.    Plaintiff and the Class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

133. California Business and Professions Code §17200 prohibits any "unlawful . . . business act or practice." Defendant has violated §17200's prohibition against engaging in an unlawful act or practice by, *inter alia*, the following:

(a) violating the statutes prohibiting defendant's conduct, as described herein, including violations of RICO, 18 U.S.C. §1962;

(b) violating the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750 *et seq.*;

(c) violating California Business and Professions Code §17500 *et seq.*;

(d) violating California Insurance Code §§330-334; 762; 780; 781; 785; 787(a), (i), (k); 789.8 *et seq.*; 790 *et seq.*; 791.03 *et seq.*, 1861.03 *et seq.*; 10127.10; 10127.13; and 10509 *et seq.*;

(e) violating California Business and Professions Code §§6125, 6126(a), 6175.3, 6175.4, and 6450;

(f) violating California Welfare and Institutions Code §§15610.30, 15656 and 15657 *et seq.*;

(g) violating California Civil Code §§1689.5 *et seq.*, 1709, 1710, 1572, 1573 and 1575;

(h) violating or aiding and abetting a violation of California Corporations Code §§25230 and 25235; and

(i) violating California Penal Code §§368 *et seq.*, 459, 484, 487, and 532.

134. Plaintiff reserves the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

135. California Business and Professions Code §17200 also prohibits any "unfair . . . business act or practice." As detailed in the preceding paragraphs, defendant engaged in a systematic scheme to sell deferred annuities to plaintiff and the Class, in violation of federal and state law, and the fundamental policies delineated

in statutory provisions. Defendant gained the trust of plaintiff and the Class, had access to their financial information and induced them into purchasing deferred annuities – all the while knowing deferred annuities are inappropriate for seniors. As a result, defendant engaged in unfair business practices prohibited by California Business and Professions Code §17200 *et seq*.

136. California Business and Professions Code §17200 also prohibits any "fraudulent . . . business act or practice." As detailed in the preceding paragraphs, defendant's conduct was likely to deceive plaintiff, the Class and the public by, *inter alia*, representing that they were providing objective financial or estate planning, and making misrepresentations and omissions about the disadvantages of purchasing a deferred annuity as a senior citizen, including the steep surrender charges and lengthy maturation periods that exceed plaintiff and other members of the class's life expectancy.

137. Defendant aided and abetted Affiliated Agents in accomplishing the wrongful acts. In doing so, defendant acted with an awareness of its wrongdoing and realized that its conduct substantially assisted in the accomplishment of the wrongful conduct.

138. As a result of defendant's practices, plaintiff and other Class Members have incurred financial losses, including access to needed funds, unnecessary and concealed fees, charges and penalties that they would not have otherwise incurred, expenses to hire a financial planner and/or attorney and the lost value in previous investments that they would not have otherwise incurred.

139. Unless defendant is enjoined from continuing to engage in the unlawful, fraudulent and unfair business practices described above, members of the general public residing within the United States, including California, will continue to be damaged.

140. Pursuant to California Business and Professions Code §17203, plaintiff seeks an order requiring defendant to immediately cease such acts of unlawful, unfair

and fraudulent business practices and requiring it to return the full amount of money improperly collected – including, but not limited to, commissions and profits from the sale of annuities and income derived from penalties and fees – to all those who have paid them, plus interest and attorneys' fees.

**FOURTH CLAIM FOR RELIEF**

**Violation of California Business &
Professions Code §17500 *et seq.***

141.  Plaintiff and the Class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

142.  Defendant has intentionally issued false or misleading marketing materials and advertisements about the deferred annuity products that it sells. Defendant's uniform sales materials and standardized annuity contract forms misled and deceived plaintiff and the Class as to the suitability of deferred annuities as investment vehicles for senior citizens.

143.  Defendant failed to disclose to plaintiff, the Class or the general public that deferred annuities are inappropriate investments for seniors, instead providing virtually uniform messages that annuities are perfect investments for seniors. Defendant failed to disclose that deferred annuities may be inappropriate because of life expectancies and their need for liquidity in the event of health care emergencies, sudden need to reside in a nursing home or other financial crises. Defendant has intentionally issued false or misleading advertisements soliciting seniors to attend seminars and workshops and other events for financial, long-term care, and estate planning, without adequately disclosing that defendant intends to sell them insurance policies.

144.  In addition, defendant has or should have approved all of Affiliated Agents' advertisements and marketing materials pursuant to California Insurance Code §787(l), and is, therefore, liable for such false or misleading advertisements even if it did not issue them directly. Affiliated Agents have intentionally issued false

or misleading advertisements representing: (i) they are certified financial planners and other bona fide service providers, without also disclosing that they are insurance agents and brokers who sell insurance for Conseco and receive compensation therefrom; (ii) their credentials, status, character or representative capacity; (iii) the services they purport to provide; and (iv) the deferred annuity policies that they sell.

145. Defendant has aided and abetted Affiliated Agents in accomplishing the wrongful acts. In doing so, defendant acted with awareness of its misconduct and knew that its conduct would substantially further the wrongful conduct.

146. As a result of defendant's misconduct as alleged herein, plaintiff and the Class have incurred actual financial losses and damages including, but not limited to, penalties, fees, charges and deductions as a result of following the advice and recommendations of defendant fees and charges for the purchase of inappropriate financial products and taxes, assessments and penalties not have otherwise incurred but reliance on defendant's misrepresentations and omissions.

147. As a direct and proximate result of defendant's wrongful conduct, plaintiff, the Class and the general public have suffered monetary and non-monetary damages.

148. Unless defendant is enjoined from continuing to engage in such wrongful actions and conduct, members of the general public will continue to be damaged by defendant's false and misleading advertising.

149. So as not to be unjustly enriched by its own wrongful actions and conduct, defendant should be required to disgorge and restore to plaintiff, members of the Class and the general public all monies wrongfully obtained by defendant as a result of its false and misleading advertising, along with interest.

# FIFTH CLAIM FOR RELIEF

## Fraudulent Concealment,
### Cal. Civ. Code §1710 *et seq.*

150.    Plaintiff and the Class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

151.    Defendant intentionally misrepresented or concealed the following material information from plaintiff and the Class:

(a)    the disadvantages of buying a deferred annuity, including tax and estate consequences and penalties, and lack of access to their annuity investments within their lifetime;

(b)    the significant commissions that Affiliated Agents earn from the sale of deferred annuities to senior citizens, including plaintiff and the Class; and

(c)    the surrender charges, penalties and other fees and expenses incurred upon early withdrawal or death by obscuring and hiding references thereto.

152.    Plaintiff and the Class relied on these representations and omissions, as shown by their purchase of the deferred annuities and payment of premiums and other charges and fees.

153.    Defendant performed the wrongful acts with the intent of gaining its own financial advantage to the disadvantage of plaintiff and the Class.

154.    Defendant aided and abetted Affiliated Agents in accomplishing the wrongful acts.  In doing so, defendant acted with an awareness of its wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct.

155.    In performing these acts, each Affiliated Agent either acted as an agent of Conseco, Conseco ratified such acts or both.

156.    As a result of defendant's wrongful conduct, plaintiff and the Class have suffered and continue to suffer economic and non-economic losses, all in an amount to be determined at trial.

157.   The wrongful acts of defendant were done maliciously, oppressively and with the intent to mislead and defraud.  Plaintiff and the Class are entitled to punitive and exemplary damages in an amount appropriate to punish and set an example of defendant pursuant to California Civil Code §3294 *et seq*.

**SIXTH CLAIM FOR RELIEF**

**Breach of the Duty of Good Faith and Fair Dealing**

158.   Plaintiff and the Class repeat and reallege all allegations contained in the Complaint as if set forth separately in this Claim for Relief.

159.   As alleged above, the relationship of insurer and insured exists between Conseco and plaintiff and the other members of the Class.  The relationship of insurer and insured creates a duty, implied in law, extending from Conseco to plaintiff and the Class to deal fairly with them and in good faith.  As a result, there is an implied obligation of good faith and fair dealing in each insurance policy.  The insurance company must not do anything to injure the right of the insured to receive the full benefits of the agreement.

160.   In addition, defendant has a duty of honesty, good faith and fair dealing arising from California Insurance Code §785(a), which provides: "All insurers, brokers, agents, and others engaged in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing."

161.   To fulfill its duty of good faith and fair dealing, the insurer must give at least as much consideration to the interests of the insured as they give to its own interests. Defendant breached that duty of good faith and fair dealing in several ways, including but not limited to:

(a)     using deceptive and misleading materials, which failed to adequately disclose the disadvantages of buying a deferred annuity, including penalties and lack of access to their annuity investments within their lifetime;

(b)　failing to disclose the significant commissions that Affiliated Agents earn from the sale of annuities to plaintiff and the Class;

(c)　obscuring and hiding references to the surrender charges, penalties and/or other fees incurred upon early withdrawal or death;

(d)　drafting and using form annuity contracts that fail to properly apprise seniors of required information and in the required format about the surrender period and associated surrender penalties in violation of California Insurance Code §10127.13;

(e)　failing to consider plaintiff and the Class's welfare above its own;

(f)　failing to comply with state law, industry standards and/or internal policies and by selling deferred annuities to seniors after issuing age exceptions without performing full and complete investigations as to appropriateness of the annuities sold to plaintiff;

(g)　failing to fully and accurately perform their brokering and underwriting duties; and

(h)　failing to competently train and supervise its Affiliated Agents and/or employees.

162.　As a proximate result of the aforementioned acts and omissions of defendant, plaintiff and the Class have suffered damages in a sum to be proven at the time of trial.  It has also become necessary for plaintiff to retain counsel to recover amounts due under the contracts.

163.　The aforementioned acts were performed maliciously, fraudulently and oppressively, thereby entitling plaintiff and the Class Members to punitive damages in an amount appropriate to punish defendant.

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment and Imposition of Constructive Trust

164.　Plaintiff and the Class repeat and reallege all allegations contained in this Complaint as if set forth separately in this Claim for Relief.

165. Defendant owed various duties to plaintiff and the Class as a result of their insurer/insured relationship and/or duty of good faith and fair dealing.

166. By engaging in the elder deferred annuity scheme, defendant extracted payments from plaintiff and Class Members, including, but not limited to, annuity premiums, commissions, service charges, surrender charges and other fees, expenses and charges based upon misleading and fraudulent uniform sales presentations, marketing materials and annuity illustrations.

167. As a result of the relationships between and among the parties and the facts stated above, defendant will be unjustly enriched if it is permitted to retain such funds; therefore, a constructive trust should be established over the monies that plaintiff and the Class Members paid to defendant. These monies are traceable to defendant.

168. The victims of the unsuitable deferred annuity sales scheme described above have no adequate remedy at law and have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

169. WHEREFORE, plaintiff, on behalf of himself and the Class, pray for judgment against defendant as follows:

(a) For a temporary, preliminary and permanent order for injunctive relief enjoining defendant from pursuing the practices complained of above;

(b) For a temporary, preliminary and permanent order for injunctive relief requiring defendant to undertake an immediate public information campaign to inform members of the general public as to its prior practices and notifying the members of the putative Class of the potential for restitutionary relief;

(c) For an order requiring disgorgement and restitution of defendant's ill-gotten gains and payment of restitution to plaintiff and the Class all funds acquired by means of any practice declared by this Court to be unlawful, fraudulent or unfair;

(d) An order certifying the Class as defined herein;

1       (e)  Distribution of any monies recovered on behalf of plaintiff or the

2    Class, via fluid recovery or *cy pres* recovery where necessary to prevent defendant

3    from retaining any of the profits or benefits of their wrongful conduct;

4       (f)  Imposition of a constructive trust;

5       (g)  For reasonable attorneys' fees and costs of investigation and

6    litigation under 18 U.S.C. §1964(c); Cal. Welf. & Inst. Code §§15657.05 *et seq.*,

7    15657.5 *et seq.*; and the common fund doctrine;

8       (h)  For compensatory, special and general damages according to

9    proof;

10      (i)  For punitive and exemplary damages under California Welfare and

11   Institutions Code §15657(a) and California Civil Code §3294;

12      (j)  For treble damages and penalties pursuant to18 U.S.C. §1964(c);

13   California Civil Code §3345; California Business and Professions Code §§6153,

14   6175.4, 6175.5 and 17206.1; and California Insurance Code §789;

15      (k)  For double damages under California Probate Code §859;

16      (l)  For transfer of the wrongfully obtained monies and/or property

17   under California Probate Code §§850-859 *et seq.*;

18      (m)  For costs of suit, pre-judgment and post-judgment interest; and

19      (n)  Such other and further relief as the Court may deem necessary or

20   appropriate.

21

22

23

24

25

26

27

28

# JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 27, 2006

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
JOHN J. STOIA, JR.
THEODORE J. PINTAR
HELEN I. ZELDES
RACHEL L. JENSEN

_____
JOHN J. STOIA, JR.

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

RENNE SLOAN HOLTZMAN
& SAKAI, LLP
LOUISE H. RENNE
INGRID M. EVANS
50 California Street, Suite 2100
San Francisco, CA 94111-4624
Telephone: 415/678-3800
415/678-3838 (fax)

JAMES, HOYER, NEWCOMER
& SMILJANICH, P.A.
CHRISTA L. COLLINS
JOHN YANCHUNIS
J. ANDREW MEYER
4830 West Kennedy Blvd.
Urban Centre One, Suite 550
Tampa, FL 33609
Telephone: 813/286-4100
813/286-4174 (fax)

Attorneys for Plaintiff

S:\CptDraft\Insurance\CPT Conseco Jones V2.doc

CLASS ACTION COMPLAINT

- 44 -

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

_____
ATTORNEY OF RECORD FOR PLAINTIFF
FRIOU P. JONES